TATE, MULLER & WITTICHEN v. MARCO & LEWENTHAL.

1. Defendants accepted the agency to sell guano for plaintiffs, the stipulated price to be paid by the buyer "in middling cotton from the first pickings" of that year, and to be secured by "a special lien upon his entire crop of cotton and corn to be made during the year." *Held*, that it would have been bad faith in the agents to sell to farmers who had given to strangers a prior lien upon their crops, but especially where the agents themselves held such prior liens are they liable to their principals for the uncollected notes of such buyers.

2. The principals having the right, under their agreement, to take possession of all the guano notes, they did not, by taking possession, confirm the acts of their agents or thereby make a settlement of accounts; but having by so doing prevented their agents from collecting, and in one case accepted a compromise, they cannot hold the agents liable for the amounts uncollected on these notes.

Before COTHRAN, J., Darlington, October, 1886.

The opinion states the case.

*Mr. R. W. Boyd,* for appellants.

*Messrs. Dargan & Dargan,* contra.

November 28, 1887. The opinion of the court was delivered by

Mr. Justice McGowan. This was an action for fifteen hundred dollars damages, alleged to have been sustained by the plaintiffs from the misconduct of the defendants, as agents, under the following circumstances: The plaintiffs, of Baltimore, copartners in manufacturing and selling fertilizers, employed the defendants as their agents to sell in Darlington, S. C., by a contract in writing, which was contained in a letter of plaintiffs to the defendants and accepted by them; and contained, among other things, the following:

"You (defendants) will sell our (plaintiffs') fertilizers on the following terms and conditions only, and no charge will be made, except with our authorization, and we reserve the right to change the terms whenever we deem it proper. The ton of 2,000 lbs. in bags in your warehouse, of 'the Equitable Ammoniated Sol Bone Phosphate of Lime,' for 475 lbs. middling cotton. * * * The cotton to be in good and dry condition, and delivered for our account in merchantable bales on or before the 1st November, 1882, on the cars at your depot, Darlington, S. C., and meanwhile to be represented by notes, or notes and liens (as the laws of your State permit), of the purchasers drawn to our order (on blanks to be furnished by us), and to be taken by you from the purchasers at the time of the delivery of the fertilizers, and promptly to be forwarded to us, not later than the 1st May, 1882. The purchasers having the right to pay for these cotton obligations at any time previous to their maturity, in money, at the rate of 15 cents per pound of cotton, but this option will cease and determine on the day of maturity of said cotton obligations. * * * Upon our request you will at any time receive back from us for safe keeping and collection any or all of said cotton notes without any extra charge. · You will promptly forward to us all the cotton collected by you for our account, or hold the same under insurance," &c., &c.

The plaintiffs alleged that under this agreement they shipped to the defendants fertilizers to the value of $5,223.57, but that they, "in violation of the terms of the agreement, sold and delivered a large proportion of the fertilizers to parties who were known by the defendants to be utterly insolvent, and with whom the defendants were doing business, and to whom they had made advances, and against whom the defendants held mortgages and agricultural liens, covering the whole value of the property owned by said parties, and exceeding the probable value of any

crops which, even under the most favorable circumstances, could have been made or raised by the respective parties during the said year" ; and "that the fertilizers so sold and delivered by the defendants were delivered to the customers of the defendants with the view solely to the benefit of themselves ; they, the defendants, well knowing that a great part of the sale so made would result in utter loss to the plaintiffs," &c., &c. And that in consequence of the failure, neglect, bad faith, and fraud of the defendants, they had sustained damage to the amount of $1,500, &c.

The defendants answered, admitting the receipt of a certain amount of fertilizers, but claiming that the plaintiffs were not entitled to any relief; and if so, such relief was equitable, and not legal, as prayed for; and also that on December 14, 1882, the whole matter of the agency was finally "settled" and the securities turned over to the plaintiffs, except a note of the defendants to the plaintiffs for $144, which was not paid on that day, only for the reason that it was then in Baltimore ; that afterwards defendants made a payment on the note, and have been, and are now, ready to pay the balance. They offered to allow judgment to be taken in the action for the balance of the note, viz., $95.58, with interest, &c.

The issues were referred to B. W. Edwards, Esq., as special referee, who took a great mass of testimony, which is in the Brief. It seems that the blanks to be provided by the agreement for the cotton notes to be taken, contained the following : "payable out of the first picking of cotton." * * * And also "that this is, and shall be, a special lien upon my entire crop of cotton and corn to be made during the year 1882," &c. ; and that the defendants, in taking notes for the fertilizers, did use the form of lien obligation furnished by the plaintiffs, except in the single case of H. Williamson, of which more will be said hereafter.

The referee found as matter of fact: "That under the terms of contract itself the plaintiffs had the right to take the notes out of the hands of the defendants at any time ; that there was no 'settlement' between Mr. White, agent of the plaintiffs, and the defendant, Lewenthal; that White did not give Lewenthal the Williamson note in lieu of the commission, but that Lewenthal

took said note and retained it; that the defendants had ample means from the crop of Williamson, agent, to pay the note, and it was a prior lien on the first cotton picked out; that the defendants were responsible for the loss sustained on the G. Richard note by the plaintiffs; and that cotton which plaintiffs should have received on the guano notes was worth 10 cents per pound; and that the defendants in a great many cases, if not in all, with the exceptions herein noted, received cotton which they applied to their own accounts, and in some were paid their liens, but applied the cotton to other advances made outside of the lien accounts," &c.

And he held as matter of law that the defendants were liable for the guano note lien of H. Williamson, agent, which was an express lien "on the first cotton picked out"; that they were liable for the balance on the L. G. Byrd note, which they could have collected; and that they were also liable on all the other notes (excepting those of Charles Dargan, W. T. Alston, David Gattison, and Joseph Wright), "for the reason that the sale of the guano was, in most instances, for their (defendants') benefit, the same being used by their customers, who, in many instances, were also their tenants, and many of whom owed them large debts; and the guano note liens were prior, being 'on the first cotton picked out,' as they were taken by them as agents of the plaintiffs, with full knowledge, and by their own act and consent," &c. According to this view, the referee found that the defendants were due the plaintiffs the sum of $1,023.08.

Upon exceptions this report came before Judge Cothran, who confirmed it and rendered a decree for the amount so found; and from this decree the defendants appeal to this court upon the following grounds:

"I. That it was error to hold that because defendants, as agents of plaintiffs, took from the vendees lien notes, 'payable in middling cotton (475 lbs.) from the first picking,' &c., they thereby waived the priority of lien taken by them for their own benefit prior to the inception of the agency, when the evidence was plenary that no such waiver was intended by the defendants or understood by plaintiffs to have been made.

"II. That it was error to hold that the relation of principal

and agent required the defendants to waive in favor of plaintiffs the priority of liens acquired prior to the inception of the agency.

"III. That it was error to sustain the referee in holding that defendants became liable for the guano note of H. Williamson, agent, upon the perfection of the transfer by Mrs. Williamson to them.

"IV. That it was error to sustain the referee in holding 'that defendants were liable on the L. G. Byrd note, for the reason that, according to their own testimony, they could have collected said note from Byrd, and this they were bound to do,' when the testimony showed only that they could have collected it if plaintiffs had left it in their hands for collection.

"V. That it was error to sustain the referee in holding defendants liable for the loss on the G. Richard note by a compromise made by plaintiffs.

"VI. That on the undisputed facts of the case, and the law applicable to the same, it was error to hold and adjudge that plaintiffs are entitled to judgment for the sum of $1,023.23," &c.

The exceptions make no reference to the suggestion of the answer, that this is really a legal action "on the case" for damages for fraud and misconduct on the part of the defendants as agents of the plaintiffs. If it were such, this court would have no right to review any fact decided. The case seems to have been treated by all parties, including the referee and Circuit Judge, as a suit in equity by principals for an account against their agents.

Exceptions 1, 2, and 3 complain that it was error to decree that the defendants must be held to have waived the priority of their individual liens upon customers, to whom they as agents afterwards sold fertilizers on notes made "payable in middling cotton from the first picking," &c. The terms of the liens taken for plaintiffs were manifestly inconsistent with the existence of prior liens upon the crop of the purchasers. If, however, such liens were taken where there were prior liens held by strangers, such lienees could not be required to waive their liens in favor of the plaintiffs, although their liens called for "cotton of the first picking," &c. But we do not understand that the same princi-

ple applies where the owners of the first lien take the second as the agents of a third party. This is a question between the principals and their agents, who placed themselves under obligations to sell fertilizers "only" on the terms and conditions that the cotton notes were to be drawn to the order of the principals according to blanks furnished, which contained these stipulations—*"payable in middling cotton from the first picking"*; and also that "this is *a special lien upon my entire crop of cotton and corn* to be made during the year 1882." The agents used the blanks as required, but it seems that they used them in cases where they knew that the lien could not be enforced according to its terms, but was probably no more than idle words.

We incline to think that this itself was bad faith to their principals, and in our view was certainly so in cases where the agents themselves were the holders of the prior agricultural liens, and in taking such delusive second liens must have known that, while the crops, upon which they held the prior agricultural liens, would be benefited thereby, the plaintiffs, for whom they acted, could not enforce their liens, according to their express terms. The arrangement in substance was, that the fertilizers should be sold "only" on first liens on the crop. Possibly, as suggested, the defendants might have found difficulty in disposing of them on those terms, but that could not justify a departure from the agreement. In that case their proper course was to retain the property undisposed of, unless the plaintiffs expressly relaxed their requirements, of which we see no evidence. The law requires perfect good faith on the part of agents, not only in form, but in spirit and substance. A distinguished writer on Equity Jurisprudence has summarized the law upon the subject of principal and agent as follows: "Equity regards and treats this relation in the same general manner, and with nearly the same strictness, as that of trustee and beneficiary. The underlying thought is that an agent should not unite his personal and representative characters in the same transaction; and equity will not permit him to be exposed to the temptation or brought into a situation where his own personal interests conflict with the interest of his principal, and with the duties he owes to his principal. In dealings without the intervention of his principal, if

an agent for the purpose of selling property of the principal, pur-
chases it himself, or an agent for the purpose of buying property
for the principal, buys it for himself, either directly or through
the instrumentality of a third person, the sale or purchase is
voidable: it will always be set aside at the option of the princi-
pal. * * * Any unfairness, any underhand dealing, any use of
knowledge not communicated to the principal, any lack of the
perfect good faith which equity requires, renders the transaction
voidable, so that it will be set aside at the option of the princi-
pal," &c. 2 *Pom. Eq. Jur.*, section 959 and notes. The
wronged principal is entitled at his option to have the contract
rescinded, or, if he elects not to have it rescinded, to have such
other adequate relief as the court may think right to give him.
See notes to 2 *Pom. Eq. Jur.*, *supra*.

By the contract of agency the lien notes were made payable to
the order of the plaintiffs, to be forwarded promptly to them.
On December 14, 1882, the plaintiffs (through their agent White)
took possession of all but the Williamson note. While we con-
cur with the referee and Circuit Judge, that the act of taking
possession according to the terms of the contract, did not amount
either to a confirmation of the acts of the agent, or a "settlement"
with them, we can well see how it might affect the question of
responsibility for failing to collect. As we understand it, the
notes of Richard and Byrd were among those which were taken out
of the hands of the defendants by the agent of plaintiffs; that the
attorney of the plaintiffs made efforts to collect them, but not suc-
ceeding as to the whole debts, the balances not collected were
charged against the defendants, on the ground that the notes
could have been collected, but were not. Assuming that the
notes were good when taken, it seems to us that the defendants
should not have been charged for failing to collect them after the
plaintiffs took control of the notes. It is true that, after the
plaintiffs took possession, their attorney advised with the defend-
ants as to the collection of the notes; but it does not clearly
appear that there ever was any distinct offer to return the notes
to them "for collection." Besides, as to the Richard note, the
regularly authorized attorney of the plaintiffs received the sum of
$560.25, and compromised the same; we do not think that the

defendants should be charged with the uncollected balances upon the notes of Byrd and Richard.

The judgment of this court is, that the judgment of the Circuit Court be affirmed, with the modification indicated as to the Richard and Byrd notes.